## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

SAMUEL KLINE AND LAUREN
KLINE *et al.*,

    *Plaintiffs*,

v.

HYUNDAI MOTOR AMERICA
INCORPORATED,

    *Defendant*.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

Civil No. 23-cv-245-BAH

## **MEMORANDUM OPINION**

Plaintiffs Samuel Kline, Lauren Kline, Howard Nordberg, Timothy Pritchett, Ioannis C. Tzamouranis, Clara K. Smith, Michael Bozzuto and Ann Lyons (collectively "Plaintiffs") brought this action against Defendant Hyundai Motor America Incorporated ("Defendant"), on behalf of themselves, and on behalf of a class of similarly situated persons who purchased or leased Hyundai Sonata Plug-in Hybrid cars ("Hybrid Vehicles") between 2016 and 2019, alleging that Defendant has not honored its New Vehicle Limited Warranty (the "Warranty") related to the Hybrid Battery System in the Hybrid Vehicles. Plaintiffs assert various contract, fraud, and consumer protection claims on this basis. ECF 13 (Second Amended Complaint), at 18–40. Pending before the Court is Defendant's motion to dismiss Plaintiffs' Second Amended Complaint ("SAC"). *See* ECF 18. Plaintiffs filed an opposition, ECF 19, and Defendant filed a reply, ECF 20. All filings include memoranda of law and exhibits.[1] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below,

---

[1] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

Defendant's Motion is **GRANTED** in part and **DENIED** in part. Counts III, V, and XII are dismissed, as are all class claims raised in Count IV. Counts I, II, VI, VII, VIII, X, XI, XIII, and XIV survive the Defendant's motion to dismiss, as do the individual claims alleged in Count IV. Count IX survives dismissal as to Plaintiffs Nordberg, Bozzuto, and Lyons, but Plaintiff Smith's claim under Count IX is dismissed.

## I.   BACKGROUND

This case concerns an alleged defect in Hyundai Sonata Plug-in Hybrid vehicles, and whether replacement of defective batteries falls within the Warranty. *See* ECF 13, at 2. Plaintiffs are purchasers of new or used Hyundai Hybrid Vehicles. They allege the Hybrid Vehicle's batteries "failed" and that Defendant did not honor their warranty obligation to replace them. *Id.* ¶ 1.

Plaintiffs allege Defendant advertised its 2016–2019 Hybrid Vehicle as capable of operating in electric mode, whereby the vehicle would be powered by a "high-capacity 9.8 Kwh lithium-ion polymer battery." *Id.* ¶ 3. This Hybrid Vehicle offered "EV mode," *i.e.*, operation on battery power alone. *Id.* at 3 ¶ 5. The car was different from previous Sonata hybrids in that the lithium-ion battery was designed to run the car independent of the gas-powered system, for up to approximately 27 miles, *id.* at 5 ¶ 22, and EV mode could handle speeds of up to 75 mph. *Id.* at 3 ¶ 5.

Plaintiffs allege Defendant advertised the Hybrid Vehicle as one that "transforms your driving experience with a highly-efficient performance in EV mode for your daily commute or HEV mode to simply relax and enjoy a long-distance drive on weekends." *Id.* at 5 ¶ 28. The Hybrid Vehicle's battery operation feature enabled an "overall driving range of 600 miles, with significant fuel economy." *Id.* ¶ 25. The total average driving range for the vehicle was 99 miles per gallon. *Id.* Defendant advertised the Hybrid Vehicle's ability to switch to "'battery charge

mode,' which used engine power to run a traction motor as a generator to recharge the battery pack relatively quickly and conveniently." *Id.* at 6 ¶ 30.

When Defendant introduced the Hybrid Vehicle in the 2016 model year, it limited the distribution of the cars at that time to dealers in California, Connecticut, Maine, Maryland, Massachusetts, New Jersey, New York, and Oregon. *Id.* at 3 ¶ 6. Hyundai dealers in other states were "occasionally able to work exchanges with dealers in authorized states, as in Ms. Smith's case, and sell the cars to customers with all the standard warranties, including the lifetime battery warranty." *Id.* ¶ 8. Plaintiffs allege that "Hyundai has never fully rolled-out the necessary infrastructure, however, in [] states where it authorized dealer sales of the car." *Id.* ¶ 7. In 2020, Defendant discontinued the Hybrid Vehicle and "essentially abandoned all those customers who purchased [Hybrid Vehicles]." *Id.* ¶ 9. In that vein, Plaintiffs allege that Hyundai's manufacturer has stopped production of the Hybrid Vehicle's battery. *Id.* ¶ 10.

### A.   The Lifetime Warranty

In this case, all named Plaintiffs purchased their cars from Defendant's authorized dealers, except Mr. Nordberg, who purchased a used Hybrid Vehicle through Carmax. ECF 13, at 7 ¶ 35; *id.* at 10 ¶ 49. Licensed dealers purchase cars from Defendant and "sell them to the public on terms established by [Defendant] in a standard [Sales and Service Agreement]." *Id.* at 7 ¶ 35. Plaintiffs allege Defendant "offered a lifetime warranty on the lithium-ion batteries in its [Hybrid Vehicles]." *Id.* at 6 ¶ 31.[2]

---

[2] As discussed *infra,* Defendant attaches two documents to its Motion to Dismiss that it represents as the operative "New Vehicle Limited Warranty" at issue in this case. *See* ECF 18-2, at 1-49. (2016 Warranty); ECF 18-3, at 2-50 (2017 Warranty). No party disputes that the language from the Warranty quoted in the SAC is taken directly from these documents. ECF 18-1, at 15 n.5; ECF 19, at 21. The Court has reviewed the attachments and notes that the language from the Warranty quoted in the SAC relates to the "Hyundai Hybrid System Warranty" and mirrors that in the 2016 and 2017 Warranty documents. *See* ECF 18-2, at 23.

The Warranty provided:

WHAT IS COVERED
Repair or replacement of HYBRID SYSTEM components listed below, originally manufactured or installed by Hyundai Motor Company, Hyundai Motor Group, . . . or [Defendant] that are found to be defective in material or factory workmanship under normal use and maintenance. . . . Repairs will be made using new Hyundai Genuine Parts or Hyundai authorized remanufactured parts.

WARRANTY PERIOD
The Warranty period for the following HYBRID SYSTEM components is limited to 10 years from the date of original retail delivery or date of first use, or 100,000 miles, whichever occurs first.

HYUNDAI LIFETIME HYBRID BATTERY WARRANTY- Original Owner Only. The Original Owner is defined as the first retail purchaser of the vehicle who took delivery of the vehicle on its date of first use. The warranty for the Hybrid Battery will remain in effect throughout the ownership period for the original owner. . . . Note: For California Emissions Vehicles certified as a partial zero-emissions vehicles, (PZEV) (excluding Delaware, Pennsylvania and Washington), the Plug-in Hybrid Battery is covered for 10 years from the date of original retail delivery or date of first use, or 150,000 miles, whichever occurs first.

*Id.* The warranty also provided that "[w]arranty service will be provided by any authorized Hyundai dealership." *Id.* ¶ 32.

For the dealership, the SAC alleges that "warranty work entails the following consideration set forth in the Dealer Sales and Service Agreement (SSA)" between Defendant and its authorized dealers:

DEALER recognizes that its Customers are entitled to prompt, courteous and professional service and that Customer satisfaction is vital to the mutual success of DEALER and [Defendant]. DEALER agrees, therefore: to take all reasonable steps to provide service and parts for all Hyundai Motor Vehicles, regardless of where purchased, and whether or not under warranty; to ensure that necessary repairs on Customer vehicles are accurately diagnosed and performed in accordance with the highest professional standards; to advise the Customer and obtain his or her consent prior to the initiation of any repairs; and, to treat the Customer courteously and fairly at all times.

*Id.* at 7 ¶ 33.

Additionally, Defendant's authorized dealers agreed to:

4

stock a sufficient quantity and variety of parts and accessories to meet Customer
demand and to perform warranty repairs and special policy work. DEALER
recognizes, however, that its Customers may reasonably expect that DEALER will
have Hyundai Genuine Parts or Accessories immediately available for purchase or
installation. DEALER, therefore, agrees to carry in stock at all times during the
term of this Agreement a complete inventory of Hyundai Genuine Parts or
Accessories, as listed in [Defendant's] current inventory guide, to enable DEALER
to meet its Customers' needs and to fulfill its service responsibilities under this
Agreement. [Defendant] reserves the right to audit DEALER's inventory from time
to time and may require DEALER to supplement its inventory to meet its
obligations hereunder.

*Id.* ¶ 34.

Plaintiffs further allege that the SSA also provided:

[Defendant] and DEALER recognize that certain Hyundai Products may be in short
supply from time to time because of factors which are beyond the control of
[Defendant] or FACTORY. Where such a shortage is determined by [Defendant]
to exist, [Defendant] will endeavor to allocate the affected Hyundai Product(s)
among its dealers in a fair and equitable manner, as it may determine in its sole
discretion.

*Id.* at 8 ¶ 37.

### B.    The Named Plaintiffs

1.    Lauren and Samuel Kline

Mr. and Ms. Kline, both residents of Maryland, purchased a new 2017 Hybrid Vehicle in

Maryland in December 2016 from Fitzgerald Hyundai, a licensed Maryland car dealer and

authorized Hyundai dealer located in Rockville, Maryland. ECF 13, at 8 ¶ 39. The total purchase

price was $37,364.51. *Id.* ¶ 40. After trading in their 2005 Honda sedan, and receiving a few other

rebate deductions, the Klines spent $32,364.651 for their vehicle. *Id.*

In December 2021, the "Kline's car battery failed." *Id.* ¶ 41. They brought the car to

Fitzgerald Hyundai for service at that time, under the terms of the warranty issued by Defendant.

*Id.* At the time of the filing of the SAC, Fitzgerald had been in continuous possession of the car

for over 16 months and had promised, but failed, to acquire or install a replacement battery.[3]  *Id.* At the time of the battery's failure, the car had "only about 48,000 miles on it." *Id.* at 9 ¶ 45.

The Klines report that they asked Fitzgerald Hyundai to buy the car back from them, "but Fitzgerald [Hyundai] refused, as the car is inoperable." *Id.* ¶ 46.  As a result of not having their own car for more than a year, the Klines "suffered considerable inconvenience and incurred significant expense, including charges for gas at prices that have, at times during the year, been higher than they had paid in many years." *Id.* at 9–10 ¶ 47.  Additionally, they allege "their cash investment of over $32,000 (plus trade-in allowance of an additional $1,500) has been rendered valueless, and to purchase a replacement vehicle at this time is difficult and much more costly, even if an acceptable hybrid or electric car could be found." *Id.*  The Klines allege they "would not have purchased the 2017 [Hybrid Vehicle] had they known that the battery would fail prematurely, and that [Defendant] would not honor the warranty. The warranty was an essential factor in the Klines' decision to purchase the car." *Id.* at 10 ¶ 48.

      2.    Howard Nordberg

In August 2019, Mr. Nordberg purchased a used 2016 Hybrid Vehicle from a Carmax dealer in Roseville, California for $24,507.94. ECF 13, at 10 ¶ 49. The car had "only 16,044 miles on the odometer." *Id.* ¶ 51.  Because of the low mileage, Plaintiffs allege "Mr. Nordberg's car battery was still covered by the HMA warranty, which explicitly afforded full warranty protection to subsequent purchasers for up to 100,000 miles or 10 years." *Id.*  In late 2022, Mr. Nordberg's

---

[3] In Plaintiffs' response in opposition of Defendant's Motion, Plaintiffs indicate that around the time of the teleconference in reference to this Motion, July 26, 2023, Plaintiffs received notice their dealer had found and installed a new battery in their car. ECF 19, at 10 n.1. This was "nearly two years after the car was brought in for repair" and the Klines submit they have not been "compensated for any damages resulting from the long delay." *Id.*  Additionally, Plaintiffs indicate that "some of the other named plaintiffs also received new batteries" but Plaintiffs do not provide further specifics. *See id.*

car began experiencing mechanical/electrical problems. *Id.* ¶ 52. In December 2022, the car lost all power and Mr. Nordberg had it towed to a Hyundai dealer—Roseville Hyundai—located in Roseville, California. *Id.* The dealer did not provide a rental car, but Mr. Nordberg rented one, and sought reimbursement from Defendant. *Id.* at 10–11 ¶¶ 53, 54.

When the battery failed in Mr. Nordberg's car, "the car had less than 39,000 miles on the odometer, meaning that he averaged less than 7,000 miles of driving the car per year." *Id.* at 11 ¶ 60. The Roseville Hyundai dealer informed Mr. Nordberg the battery needed replacement and it would take approximately three months to acquire the part. *Id.* ¶ 55. Although Mr. Nordberg was originally told that his battery replacement might be scheduled for March 2023, Mr. Nordberg was "also informed by a Hyundai representative [] that the repair might take much longer and that the wait for the battery could be indefinite." *Id.* ¶ 61. Mr. Nordberg was also informed by a Hyundai representative that the battery manufacturer had stopped producing the model battery that the Hybrid Vehicle required. *Id.* at 11–12 ¶ 61.

As a result of not having his own car, Mr. Nordberg alleges he "has suffered considerable inconvenience and incurred significant expense, including charges for gas at prices that have, at times during the year, been higher than he had paid in many years" and he alleges his "cash investment in the car has been rendered valueless, and to purchase a replacement vehicle at this time is difficult and much more costly, even if an acceptable hybrid or electric car could be found." *Id.* at 12 ¶ 62.

        3.    Timothy Pritchett

In February 2018, Mr. Pritchett, a resident of Oregon, ECF 13, at 4 ¶ 13, leased a new 2017 Hybrid Vehicle for 36 months. *Id.* at 12 ¶ 63. In April 2022, Mr. Pritchett took his vehicle to the dealer after seeing error codes on his dashboard, and the dealer informed Mr. Pritchett that the battery needed to be replaced and would be covered under the lifetime warranty. *Id.* ¶¶ 65, 66.

7

Defendant then informed Mr. Pritchett only the battery computer module would be replaced, not the entire battery. *Id.* ¶ 67. The battery computer module was unavailable for five months and after it was installed, "problems with the car persisted." *Id.* at 13 ¶ 68. "Mr. Pritchett was then informed by the dealer that a new battery was needed, and that it had been ordered." *Id.*

From April to October 2022, the car was operable, but Mr. Pritchett had concerns about the safety of the vehicle given the "dashboard of error messages and warning lights." *Id.* ¶ 69. The vehicle eventually became inoperable and has been at the dealership since October 2022. *Id.* ¶ 70. Mr. Pritchett alleges the same types of damages as alleged by the Klines and Mr. Nordberg, namely that the inconvenience and expense of not having his vehicle for a significant length of time (in Mr. Pritchett's case—six months) and the depreciation of his cash investment in the car has caused significant damages. *Id.* ¶ 71.

### 4.    Ioannis C. Tzamouranis

Mr. Tzamouranis, a resident of Connecticut, ECF 13, at 4 ¶ 14, purchased a new 2017 Hybrid Vehicle in November 2016, which began to experience "diminishing range in battery-operation mode" in late 2022 when the vehicle had approximately 50,000 miles on it. *Id.* at 13 ¶¶ 72, 74; *id.* at 21 ¶ 123. In January 2023, the vehicle's "engine warning lights illuminated, [Mr. Tzamouranis] experienced the vehicle actively braking, and [he] was increasingly concerned about the lower mileage range." *Id.* at 14 ¶ 75. As of the time of the filing of the SAC (April 20, 2023), Mr. Tzamouranis' vehicle was still at the dealership, and he had been deprived of his vehicle for approximately three months. *Id.* ¶ 77. Ms. Tzamouranis alleges the same types of damages as his co-plaintiffs. *See id.*

### 5.    Clara K. Smith

Ms. Smith, a resident of Arizona, ECF 13, at 4 ¶ 15, purchased a new 2016 Hybrid Vehicle in April 2016 from Swanty Hyundai in Kingman, Arizona. *Id.* at 14 ¶ 78. Arizona was not one of

8

the states in which Defendant organized the distribution of the Hybrid Vehicles. *Id.* at 3 ¶ 6. Nevertheless, Swanty Hyundai was able to locate a new 2016 Hybrid Vehicle at a California dealership, acquire it, and sell it to Ms. Smith. *Id.* at 14 ¶ 80.

In late 2022, Ms. Smith drove the car to Illinois, "where it died due to battery failure." *Id.* ¶ 81. When the battery failed, the vehicle had under 20,000 miles on it. *Id.* A dealer in Algonquin, Illinois (Rosen Hyundai) diagnosed the problem in November 2022 and informed Ms. Smith that the battery needed to be replaced. *Id.* at 15 ¶ 82. Rosen Hyundai has held the car for repairs continually since then. *Id.* ¶ 83. Ms. Smith alleges the same theory of damages as each of the co-plaintiffs, which is based on the expenses incurred from being deprived of her vehicle for more than six months and the depreciation of her investment in the vehicle. *Id.* ¶ 84.

6.     Michael Bozzuto and Ann Lyons

The last of the named Plaintiffs—Mr. Bozzuto and Ms. Lyons—are California residents, ECF 13, at 4 ¶ 16, who purchased a new 2017 Hybrid Vehicle in May 2017 for $46,239.78. *Id.* at 15 ¶ 85. In August 2022, when the vehicle had approximately 135,000 miles on it, Mr. Bozzuto noticed "delays in engine acceleration, as well as a clunking noise." *Id.* ¶ 87. On September 27, 2022, "the car froze at a traffic light." *Id.* ¶ 88. It was towed to Hanlees Hilltop Hyundai where, as of the time of the filing of the SAC, it had remained for nearly seven months. *Id.* ¶ 88. Though a battery was allegedly promised on numerous occasions, on April 14, 2023, the dealer informed Mr. Bozzuto that no battery was available. *Id.* at 16 ¶ 89. Mr. Bozzuto and Ms. Lyons assert the same theory of damages as each of the co-plaintiffs, which is based upon the expenses incurred from being deprived of their vehicle for more than seven months and the depreciation of their investment in the vehicle. *Id.* ¶ 90.

9

## II.     LEGAL STANDARD

### A.     Motion to Dismiss Under Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) governs dismissals for failure to "state a claim upon which relief can be granted." In considering a motion under this rule, courts discount legal conclusions stated in the complaint and "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A court then draws all reasonable inferences in favor of the plaintiff and considers whether the complaint states a plausible claim for relief on its face. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 253 (4th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.

"The complaint must offer 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'" *Swaso v. Onslow Cnty. Bd. of Educ.,* 698 F. App'x 745, 747 (4th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). At the same time, a "complaint will not be dismissed as long as [it] provides sufficient detail about [the plaintiff's] claim to show that [the plaintiff] has a more-than-conceivable chance of success on the merits." *Owens v. Balt. City State's Att'ys Off.,* 767 F.3d 379, 396 (4th Cir. 2014).

The Court may consider "documents attached to the complaint, 'as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic.'" *Fusaro v. Cogan,* 930 F.3d 241, 248 (4th Cir. 2019) (quoting *Philips v. Pitt Cnty. Mem. Hosp.,* 572 F.3d 176, 180 (4th Cir. 2009)). A document is "integral" when "its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC,* 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis omitted). In this case, the Court considers ECF 18-2 and ECF 18-3, the Hyundai

10

Warranty Information at issue in this case, as integral to Plaintiffs' SAC. ECF 18-2, at 1–49. (2016 Warranty); ECF 18-3, at 2–50 (2017 Warranty).  These documents are integral because their very existence gives rise to certain legal rights asserted in the SAC, namely Plaintiffs' breach of warranty and contract claims.  *See, e.g., Thaler v. Donald J. Trump for President, Inc.*, 304 F. Supp. 3d 473, 477 n.5 (D. Md. 2018), *aff'd*, 730 F. App'x 177 (4th Cir. 2018) ("A contract is integral to a breach of contract claim[] . . . ."); *see also Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) ("[I]f a breach-of-contract plaintiff alleges a failure to perform an act required by the contract, the contract's description of the defendant's duties will prevail over the plaintiff's contrary characterization.").  Defendant attached these exhibits to its Motion and provided a declaration affirming the authenticity of both exhibits.  ECF 18-4, at 1–2.  Plaintiffs refer to the exhibits in their Response and do not contest their authenticity. *See* ECF 19, at 21–22.

### B.      Heightened Pleading Standard Under Rule 9(b)

A party alleging fraud must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783–84 (4th Cir. 1999).  To satisfy the heightened pleading standard set forth in Rule 9(b), a plaintiff "must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby."  *Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 219 (4th Cir. 2015) (quoting *Harrison*, 176 F.3d at 784).  Stated differently, a plaintiff must plead the "who, what, when, where, and how of the alleged fraud." *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (internal quotation marks and citations omitted); *see also U.S. ex rel. Palmieri v. Alpharma, Inc.*, 928 F. Supp. 2d 840, 853 (D. Md. 2013); *Harden v. Budget Rent A Car Sys., Inc.*, Civ. No. GLS-22-1790, 2024 WL 1299356, at *6 (D. Md. Mar. 27, 2024).

One purpose of this Rule is to prevent "frivolous suits" that amount to no more than a fishing expedition. *U.S. ex rel. Nicholson v. MedCom Carolinas, Inc.*, 42 F.4th 185, 195 (4th Cir. 2022). However, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* (internal quotation marks omitted) (quoting *Harrison*, 176 F.3d at 784 and *Harden*, 2024 WL 1299356, at \*6).

### III.  ANALYSIS

Plaintiffs assert various contract, fraud, and consumer protection claims.[4] ECF 13, at 18–40. The Court will address each claim in turn.[5]

#### A.  Contractual Claims: Counts I–III, and V

Plaintiffs bring four claims based in contract: Count I (Breach of Contract); Count II (Breach of Express Warranty); Count III (Breach of Implied Warranty of Merchantability); and Count V (Declaratory Judgment on Entitlement Under the Contract). *See* ECF 13, at 18–27. Applying Maryland law, the Court addresses Defendant's arguments relating to these counts: (1) Plaintiffs failed to state a claim because they alleged a design defect, not a manufacturing defect; (2) Plaintiffs failed to state a breach of contract claim because there is no privity of contract between Plaintiffs and Defendant; (3) Plaintiffs' Count III is time barred; and (4) Count V is duplicative of Count I. As explained below, Defendant's Motion will be denied as to Counts I and

---

[4] Plaintiff alleges that the Court has diversity jurisdiction in this matter under 28 U.S.C. § 1332(d) because the amount in controversy exceeds $5,000,000 and because Defendant and many putative class members are citizens of different states. ECF 13, at 16 ¶ 91; *id.* at 4 ¶ 11–18.

[5] The Court will not address standing. Defendant originally alleged Plaintiffs lacked standing to bring this suit on behalf of unnamed plaintiffs in Maine, Massachusetts, New Jersey and New York, as none of the named Plaintiffs reside in those states. *See* ECF 18-1, at 18; ECF 13, at 4 ¶¶ 11–18. Ultimately, Defendant withdrew this argument in reply, ECF 20, at 2 n.1.

II. *See infra* Section III.A.1-2. Defendant's Motion will be granted as to Counts III and V. *See infra* Section III.A.3-4.

As a preliminary matter, the Court addresses choice of law under Plaintiffs' contractual claims. A federal court sitting in diversity applies the choice-of-law rules of the state in which it sits. *Williams v. Gyrus ACMI, Inc.*, 790 F. Supp. 2d 410, 414 (D. Md. 2011) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)); *Francis v. Allstate Ins. Co.*, 709 F.3d 362, 369 (4th Cir. 2013). "Under Maryland law, where the contract contains no choice of law clause, courts [] apply the law of the jurisdiction where the contract was made." *Chubb & Son v. C & C Complete Servs., LLC*, 919 F. Supp. 2d 666, 676 (D. Md. 2013) (internal citation and quotation marks omitted); *Ford v. Genesis Fin. Sols., Inc.*, Civ. No. DLB-23-2156, 2024 WL 1340356, at *5 (D. Md. Mar. 28, 2024) ("In Maryland, the law of the state 'where the last act is performed which makes an agreement a binding contract' governs." (quoting *Grain Dealers Mut. Ins. Co. v. Van Buskirk*, 215 A.2d 467, 471 (Md. 1965))); *Bailey v. Mercury Fin., LLC*, Civ. No. DKC-23-827, 2023 WL 6244591, at *4 (D. Md. Sept. 26, 2023) ("In Maryland, 'the law of the jurisdiction where the contract was made controls its validity and construction.'" (quoting *Kramer v. Bally's Park Place, Inc.*, 535 A.2d 466, 467 (Md. 1988))). Plaintiffs assert that the law applied to each Plaintiff's claim will vary because "the last act [] performed" to make an agreement a binding contract occurred in different states, as each Plaintiff purchased their vehicle and accepted the Warranty in their home forums. *See* ECF 13, at 4 ¶¶11-18; *id.* at 8 ¶ 39; *id.* at 10 ¶ 49; *id.* at 14 ¶ 78; *id.* at 15 ¶ 85.

Defendant argues that the Court need not decide which states' substantive law applies because there is no conflict amongst the various jurisdictions, which have all adopted identical or virtually identical versions of the Uniform Commercial Code governing the sale of goods. ECF

18-1, at 22–23[6]; *see, e.g., Lebegern v. Forman*, 471 F.3d 424, 429–30 (3d Cir. 2006) ("[T]he initial step in choice-of-law questions is a determination of whether there is a distinction *in the laws* of particular jurisdictions." (emphasis in original) (citation omitted)).

Other judges in this district have, in similar contexts, elected to proceed under Maryland law, where the choice of a state's codification of a UCC variation was immaterial. *See Archer W. Contractors, LLC v. Synalloy Fabrication, LLC*, Civ. No. CCB-14-3031, 2016 WL 930965, at *4 (D. Md. Mar. 11, 2016) (considering a contract's formation and noting that the three potential forum state laws to apply (Tennessee, Georgia, and Maryland) all codified the UCC "in virtually identical language" and as such, the court declined to analyze which state's law applied and applied Maryland law); *see also Lowry's Reps., Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 750 (D. Md. 2003) (noting that "[c]onflict rules are appealed to only when a difference in law will make a difference to the outcome" and therefore holding that because "the laws of Maryland and Florida do not so conflict, the choice is immaterial, and the law of the forum—Maryland—governs." (quoting *Int'l Adm'rs, Inc. v. Life Ins. Co. of N. Am.*, 753 F.2d 1373, 1376 n. 4 (7th Cir.1985))).

Given that Plaintiffs do not disagree with Defendant's point, *see generally* ECF 19,[7] the Court accepts Defendant's position and applies Maryland law. As the Fourth Circuit has recently

---

[6] Defendant addresses the immateriality of a choice-of-law analysis only when addressing Count III and fails to raise this argument expressly as to Counts I and II. *See* ECF 18-1, at 19–20 (citing cases that rely on California, Maryland, New Jersey, Indiana, and Illinois law in seeking the dismissal of Counts I and II on the basis of the complaint alleging a "design defect" as a matter of law); *id.* at 21 (citing "hornbook law" from Arizona, California, Connecticut, Oregon, and Maryland in arguing that Count I should be dismissed for lack of privity). Though less than clear, the Court construes Defendant's motion as asserting that the choice of law is immaterial as to Counts I and II as well based upon the uniformity of the various states, as demonstrated by Defendant's citation to the law of each Plaintiff's forum. *See id.*, at 19–20.

[7] Plaintiffs appear to agree that the choice of law is immaterial. *See* ECF 19, at 22 (citing to § 313 of the UCC, which is "enacted in all eight states where [Defendant] sold the [Hybrid Vehicle]"). Plaintiffs also rely on Maryland law. *See* ECF 19, at 23 (citing Md. Code Ann., Comm. Law §§ 14-401, 14-407).

reiterated, "choice of law issues may be waived." *Wiener v. AXA Equitable Life Ins. Co.*, 58 F.4th 774, 780 (4th Cir. 2023) ("All U.S. Courts of Appeals to have addressed the issue have held that choice of law issues may be waived." (citation omitted)). Therefore, in this case where Plaintiffs hail from California, Oregon, Connecticut, Arizona, California, and Maryland, and the UCC is codified "in identical or virtually identical language" in each of these states, and given the lack of opposition from Plaintiffs, the Court finds the choice of law is immaterial, and the law of the forum will govern. *See Lowry's Reps., Inc.*, 271 F. Supp. 2d at 750.

      1.     Counts I and II are not dismissed for allegedly pleading a "design defect."

As to both Counts I and II, Defendant argues Plaintiffs' SAC fails to allege a defect that falls under the Warranty because they have alleged a *design* defect, which is not covered under the Warranty. *See* ECF 18-1, at 19. Both parties appear to agree that, *inter alia,* the Warranty only covers repairs or replacements resulting from *manufacturing* defects, not *design* defects. *See* ECF 18-1, at 20 ("Plaintiffs plead a non-covered design defect."); ECF 19, at 20–21 (disputing Defendant's contention that Plaintiffs have alleged a "design" defect). The parties are correct on this point as courts have consistently held that design defects are not within the scope of a warranty aimed at covering only manufacturing defects. *See, e.g., Coba v. Ford Motor Co.*, 932 F.3d 114, 123 (3d Cir. 2019) (applying New Jersey law and noting that "courts have regularly rejected arguments like [the plaintiff's] that a design defect is within the scope of a materials-and-workmanship warranty clause"); *Bruce Martin Constr. v. CTB, Inc.*, 735 F.3d 750, 753 (8th Cir. 2013) (applying Indiana law and noting that "case law supports the view that, where a product is manufactured correctly but designed inappropriately, the defect is one of design and not 'material or workmanship'"); *Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516, 526–27 (7th Cir. 2003) (applying Illinois law and holding a plaintiff that alleged defectively designed airbags had not stated a claim for breach of express warranty where only manufacturing defects were warranted).

The parties disagree, however, about whether it is appropriate at the motion to dismiss stage for the Court to rule as a matter of law that the Plaintiffs alleged only a design defect. *See* ECF 19, at 20–21; ECF 20, at 5–8.

Defendant points to the "universal" nature of Plaintiffs' allegations in the SAC as indicative of a design defect, as opposed to a manufacturing defect. *See* ECF 20, at 7; *see also* ECF 18-1, at 20 (highlighting that the SAC proposes the Class as: "*all* persons who purchased or leased new 2016–2019 Hyundai Sonata Plug-in Hybrid cars . . ., or who purchased used Hyundai Sonata Plug-in Hybrid cars which qualified for HMA's battery warranty coverage." (emphasis in original)). Plaintiffs counter that the "allegations in the [Second] Amended Complaint describe the defect from a consumer's perspective." ECF 19, at 20–21 (quoting *Napoli-Bosse v. GM LLC*, 453 F. Supp. 3d 536, 548 (D. Conn. 2020)). Plaintiffs quote *Napoli-Bosse* directly and contend that the allegations in the SAC "do not speak to the genesis of the defect, of which a plaintiff cannot be expected to have any knowledge prior to discovery." ECF 19, at 20 (quoting *Napoli-Bosse*, 453 F. Supp. 3d at 548).

In *Napoli-Bosse*, the District Court for the District of Connecticut was faced with allegations of a defect in a GMC Acadia that defendant, as here, alleged was as a design defect and thus not covered under the applicable warranty. 453 F. Supp. 3d. at 548 ("GM argues that because Napoli-Bosse alleged that 'all class vehicles' suffer from the alleged defect, she has necessarily alleged a design defect, and not a manufacturing defect." (citation omitted)). In rejecting this claim, the *Napoli-Bosse* Court noted that:

> [i]t is certainly possible that a defect affecting all 2017 and 2018 Acadias stemmed from a design decision made by GM. But it is also possible that such a defect was caused by a deficiency in the process through which all of these Acadias were manufactured, or from an incorrect or defective material provided by one of GM's suppliers, contrary to the design specification. To make the former inference in favor of GM would be to invert the motion to dismiss standard.

16

*Id.* Given that the court must draw all reasonable inferences in favor of the plaintiff when considering a motion to dismiss, the *Napoli-Bosse* court continued by observing that "it is simply not possible for this Court to know the genesis of the alleged defect at this stage." *Id.* Other courts have come to similar conclusions. *See McCarthy v. Toyota Motor Corp.*, No. 18-cv-0201, 2018 WL 6318841, at \*8 (C.D. Cal. Sept. 14, 2018) ("The Court cannot conclude at this stage whether the [alleged defect] is the result of defective design, workmanship, materials, or manufacture, and thus the Court cannot determine whether the warranty, as alleged, covers [the defect]. These are issues that 'are better dealt with at the summary judgment stage.'"); *In re Volkswagen Timing Chain Prod. Liab. Litig.*, Civ. No. 16-2765, 2017 WL 1902160, at \* 12 (D.N.J. May 8, 2017) ("Courts within this district have refused to apply a distinction between a defect in design and a defect in materials or workmanship at the pleadings stage of litigation."); *Johnson v. FCA US LLC*, 555 F. Supp. 3d 488, 499–500 (E.D. Mich. 2021) ("Because the facts [plaintiffs] allege here could be consistent with a defect in manufacturing or materials, they 'are not required to commit to a single theory of the origin of the [Panel Defect] at this [early stage].'" (quoting *Gregorio v. Ford Motor Co.*, 522 F. Supp. 3d 264, 288 (E.D. Mich. 2021)) (brackets in original)).

Defendant points to a small number of cases in which courts concluded that allegations in a complaint that "all" products suffered from a defect necessarily meant that a plaintiff was alleging a design defect. *See* ECF 18-1, at 20 (citing *Gertz v. Toyota Motor Corp.*, Civ. No. 10-1089, 2011 WL 3681647 (C.D. Cal. Aug. 22, 2011); *Rollolazo v. BMW of N. Am., LLC*, Civ. No. 16-00966, 2017 WL 1536456, at \*11 (C.D. Cal. Feb. 3, 2017); *Cumberland Ins. Grp. v. Delmarva Power*, 226 Md. App. 691, 712 n.9 (2016); *Coba*, 932 F.3d at 123; *Bruce Martin Constr. v. CTB,*

17

*Inc.*, 735 F.3d 750, 753 (8th Cir. 2013)).[8] It bears noting that the plaintiffs in *Gertz*, the case on which Defendant principally relies, apparently did not contest the defendant's argument that the complaint there alleged only design defects, which were not covered under the warranty at issue in that case. *Gertz*, 2011 WL 3681647, at *3 n.4. Regardless, this decade-old, unpublished decision does not outweigh the clear weight of the recent authority Plaintiffs present.[9] *See Napoli-Bosse*, 453 F. Supp. 3d at 548; *Johnson*, 555 F. Supp. 3d at 499–500; *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *12.

The other cases cited by Defendant on this point do not compel a different conclusion. For example, the plaintiffs in *Rollolazo* appeared to challenge whether the warranty in that case was "limited to materials or workmanship," thus potentially encompassing design flaws in the form of "defective parts and components." 2017 WL 1536456, at *11. When the *Rollolazo* court held that the warranty was unambiguous in not covering deign defects, it took no analysis to dismiss breach of warranty claims since the plaintiffs there, unlike here, had unquestionably raised "allegations [that] reflect[ed] claims of a design defect." *Id.* Moreover, the footnote cited by Defendant from *Cumberland Insurance Group v. Delmarva Power*, *see* ECF 18-1, at 19 (citing 130 A.3d 1183, 1196), merely parrots the language of *Schmid v. Milwaukee Elec. Tool Corp.*, a Third Circuit case addressing the propriety of striking the testimony of an expert witness in a case that no party disputed was "a *design* defect case" and "not a case where plaintiff contends that the particular

---

[8] *Napoli-Bosse* notes one additional case addressing the debate over the significance of pleading defects that affect the entirety of a class of products. 453 F. Supp. 3d at 548 (*citing Bruce Martin Const., Inc. v. CTB, Inc.*, No. 10-cv-205, 2012 WL 6203112, at *4 (E.D. Mo. 2012)). However, *Bruce Martin Const., Inc.* was decided at the summary judgment stage after the plaintiffs had the opportunity to present expert testimony on the issue. *See Bruce Martin Const., Inc.*, 2012 WL 6203112, at *5 ("In short, plaintiff's argument that the wheel and backboard problems constitute 'materials' defects is utterly unsupported by its own expert.").

[9] Indeed, Plaintiffs point to contrary and more recent caselaw within the same district as *Gertz*. *See* ECF 19, at 21 (*citing McCarthy*, 2018 WL 6318841, at *8).

[product] causing his injuries was defectively manufactured." 13 F.3d 76, 79 (3d Cir. 1994) (emphasis in original). At best, *Schmid* reiterates the uncontroversial proposition that a design defect differs from a manufacturing defect and thus provides no insight into whether the instant complaint should be dismissed.[10] *Coba v. Ford Motor Co.* similarly fails to support dismissal of Plaintiffs' express warranty claim at this stage since the district court in *Coba* waited until the summary judgment stage, after the genesis of the defect alleged there had been determined. 932 F.3d at 123 (holding "the [district] court properly entered *summary judgment* on [the plaintiff's] breach-of-warranty claim." (emphasis added)). *Bruce Martin Const., Inc.* also presented a scenario where summary judgment was granted on a breach of warranty claim after the plaintiff's "own expert agreed" that the complaint alleged that the product at issue was "manufactured correctly but designed inappropriately" and where the plaintiff asserted "that the *design* was defective in calling for unsuitable materials, essentially arguing that the defect is both one of design and one of material." 735 F.3d at 753–54 (emphasis added).

In Reply, Defendant also appears to raise an alternative argument: that the cases Plaintiffs rely upon distort the *Twombly* standard by permitting claims to proceed past the motion to dismiss stage so long as they allege the "possibility" of a manufacturing defect, as opposed to "plausibility" of a manufacturing defect, as mandated by *Twombly*. ECF 20, at 7 (citing 550 U.S. at 579). Defendant argues that "Plaintiffs cannot point to a single allegation describing a flaw in the manufacturing process." ECF 20, at 7. A thorough review of the SAC reveals that this is a true statement. It is likely true that Plaintiffs lack detailed knowledge of how the Hybrid Vehicle at

---

[10] Defendant's Reply also focuses on this uncontested principle that design defects are not covered by a warranty for manufacturing defects. ECF 20, at 6. While Defendant is correct that this is the "majority view," *id.*, the issue before the Court presents the separate question of whether the Court should infer at the motion to dismiss stage that a plaintiff is alleging a design defect based merely on a plaintiff's use of the word "all" to describe the class.

issue was manufactured. However, this fact countenances the initiation of discovery, not summary dismissal of a breach of warranty claim, so long as Plaintiffs have pled a plausible claim that a manufacturing defect is the source of the Hybrid Vehicles' battery defects. In this regard, Plaintiffs have met their low burden at this stage by plausibly alleging a defect, the source of which is not immediately ascertainable. To infer otherwise, as the *Napoli-Bosse* court noted, "would be to invert the motion to dismiss standard." 453 F. Supp. 3d at 548.

The result may be different had Plaintiffs used language to plead their claims that left little room for debate that the allegations concerned a flaw in design, as opposed to a manufacturing defect. For example, in *In re Toyota RAV4 Hybrid Fuel Tank Litig.*, the court cited to a "key section of the complaint," wherein the plaintiffs cataloged articles and news reports in which Toyota, the manufacturer of the allegedly defective product at issue (the gas tank on a particular hybrid vehicle) was investigating a "design defect" and had identified a "design flaw" in the gas tank. 534 F. Supp. 3d 1067, 1087 (N.D. Cal. 2021). "Even more tellingly," the court noted, "the complaint alleges that 'Toyota failed to inform' each plaintiff and fellow members of each state-based class 'that RAV4s contain defectively designed fuel tanks that prevent the tank from filling to capacity.'" *Id.* Other than a citation to the proposed class as including "'all persons' who purchased or leased new 2016-2019 Plug-in Hybrids or purchased used Plug-in Hybrids qualifying for battery warranty coverage," ECF 20, at 7 (citing ECF 13, at 16 ¶ 93), Defendant points to no other language in the SAC that compels a finding that the allegations here are limited to design defects.

Moreover, the SAC alleges differences in the experiences of the individual Plaintiffs that support the argument that the defect at issue is covered under the Warranty. Some Plaintiffs reported that their battery gradually petered out, whereas others reported it suddenly failed without

20

warning. *Compare* ECF 13, at 10 ¶ 52 (alleging Mr. Nordberg experienced a gradual accrual of mechanical/electrical problems and then a sudden loss of all power) *with id.* at 14 ¶ 81 (alleging Ms. Smith experienced sudden engine failure when driving from Arizona to Illinois). Some Plaintiffs reported warnings on the dashboard screen, whereas others made no such reports. *Compare id.* at 12 ¶ 65 (alleging Mr. Pritchett began to experience error codes on his dashboard screen but never experienced total power loss) *with id.* at 14 ¶ 81 (alleging Ms. Smith experienced sudden engine failure and making no mention of any error messages or warnings).

While Defendant may discount these differences, if Plaintiffs alleged that these failures were caused by design defects, as Defendant asserts, it would be reasonable to assume the defects would be universal. *See* ECF 20, at 7 (noting "the fundamental, definitional difference between a design defect, which is universal, and a manufacturing defect, which is not"). But here, the batteries at issue apparently withstood different mileage accrual. *See, e.g.,* ECF 13, at 9 ¶ 45 (alleging the Klines put 48,000 miles on their vehicle before battery failure); *id.* at 14 ¶ 81 (alleging Ms. Smith had less than 20,000 miles on her vehicle when it became inoperable). The Hybrid Vehicle failures also proceeded differently. *See, e.g., id.,* at 10 ¶ 52 (alleging Mr. Nordberg experienced a more gradual accrual of mechanical/electrical problems and then a sudden loss of all power); *id.* at 12 ¶ 65 (alleging Mr. Pritchett began to experience error codes on his dashboard screen but never experienced total power loss); *id.* at 13 ¶ 74 (alleging Mr. Tzamouranis first noticed diminishing range in battery-operation mode, then months later saw "his engine lights illuminated [and] experienced the vehicle actively braking"); *id.* at 14 ¶ 81 (alleging Ms. Smith experienced sudden engine failure when driving from Arizona to Illinois). In other words, as alleged in the SAC, the vehicle failures are not so uniform as to lead to the inescapable conclusion

that Plaintiffs have alleged a design defect as a matter of law. As such, Plaintiffs' breach of contract and express warranty claims plausibly allege a manufacturing defect.

> 2.     Count I is not dismissed for want of privity.

Defendant also challenges Count I due to lack of privity. ECF 18-1, at 21. Defendant argues that "[n]one of the Plaintiffs contracted with [Defendant]" and "[a]ll bought their Subject Vehicles from independent third-party dealers or resellers." *Id.* (citing ECF 13, at 8 ¶ 39; *id.* at 10 ¶ 49, *id.* at 12 ¶ 63; *id.* at 14–15 ¶¶ 78, 85). Plaintiffs do not address this argument head on but instead counter that representations made within the Warranty became "part of the basis of the bargain" supporting privity. *See* ECF 19, at 22 (citing the Warranty, which states "[t]hese stated warranties give you specific rights"); *see also* ECF 18-2, at 18 ("[Defendant] warrants your new 2016 Hyundai vehicle pursuant to the limited warranties described in this Owner's Handbook.").

The parties both appear to agree that "manufacturer documents given directly to the buyer prior to a purchase may give rise to an express warranty because the assertions become part of the basis of the bargain unless clear affirmative proof shows otherwise." *Canadian Pac. Ry. Co. v. Williams-Hayward Protective Coatings, Inc.*, Civ. No. 2-C-8800, 2005 WL 782698, at \*15 (N.D. Ill. Apr. 6, 2005); ECF 19, at 23–24 (citing same); ECF 20, at 8 (citing same). However, Defendant argues that Plaintiffs failed to allege that Defendant, in fact, provided the Warranty "directly to" the Plaintiffs prior to Plaintiffs' vehicle purchases. *See* ECF 20, at 8 ("[T]he SAC nowhere alleges that any Plaintiff received the [Warranty] before purchase, and therefore does not establish that the [Warranty] ever became part of the basis of the bargain.").

As an initial matter, Defendant's argument that Plaintiffs have failed to allege privity because "[n]one of the Plaintiffs contracted with [Defendant]" and "[a]ll bought their Subject Vehicles from independent third-party dealers or resellers," fails. ECF 18-1, at 21. As the court recognized in *Gregorio v. Ford Motor Company*, "[t]he market for new cars is structured such that

22

drivers must buy from an authorized dealer and do not have the option to buy directly from [the manufacturer]." 522 F. Supp. 3d 264, 293 (E.D. Mich. 2021). As such, the court held that "the warranties [the manufacturer] provides are clearly meant to benefit the ultimate consumer, not the dealer." *Id.*; *see also Morales v. Toyota Motor Sales, U.S.A., Inc.*, 494 F. Supp. 3d 709, 719 (C.D. Cal. 2020) ("Plaintiff claims that Toyota has contracts with its dealerships that were designed for and intended to benefit the ultimate customers only. These allegations, which concern the existence of a contract as well as a sufficiently immediate benefit intended for Plaintiff, are sufficient to establish that Plaintiff is an intended third-party.") (citations omitted). Here, the Warranty contains the following clause: "These stated warranties give you specific legal rights." ECF 18-2, at 18, ECF 18-3, at 16. Plaintiffs assert that the statement is "not addressed to the dealers; it is addressed to the purchasers." ECF 19, at 22. Plaintiffs also allege that "[l]icensed [Hyundai] dealers purchase cars from [Hyundai], and sell them to the public on terms established by [Hyundai] in a standard [Sales and Service Agreement]." ECF 13, at 7 ¶ 35. Accordingly, the SAC plausibly alleges that the Plaintiffs were the intended beneficiary of the contract between Hyundai and its authorized dealerships, thus establishing privity.

Moreover, the SAC alleges that Defendant "provided [the Warranty] to purchasers, including the named Plaintiffs who purchased or leased new cars, and all Class members who purchased or leased new cars[.]" ECF 13, at 6 ¶ 31. The Warranty provisions at issue also describe the relevant coverage period as commencing on "the date of original retail delivery or date of first use." ECF 18-2, at 23; 18-3, at 18. As evaluating a complaint under Rule 12(b)(6) is "a context-specific task," the Court may "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *see also Nemet Chevrolet, Ltd.*, 591 F.3d at 253 (emphasizing that a court must draw all reasonable inferences in favor of the plaintiff when considering whether the complaint states a

plausible claim for relief on its face). Though the SAC does not explicitly note the date and time the Warranty was provided to Plaintiffs, it stands to reason that a warranty for a car that applies from the date of original retail delivery, or first use, is provided and accepted during the car-purchasing process. Plaintiffs vaguely allege as much when they state that they are "parties to a warranty issued by [Defendant]." ECF 13, at 18. Stated differently, it would defy common sense for such a warranty to be provided for no consideration after the purchaser decided to make the purchase, and Defendant's argument to the contrary is unconvincing. Moreover, it is a reasonable inference that the Warranty was provided to Plaintiffs prior to purchase. Thus, Plaintiffs have plausibly pled contractual privity because the Warranty was a part of the basis of the bargain.[11]

> 3. Count III is dismissed because Defendant established that it is "clearly" time barred.

Defendant alleges Count III should be dismissed as time barred. ECF 18-1, at 22. "The raising of the statute of limitations as a bar to plaintiffs' cause of action constitutes an affirmative defense[.]" *Dean v. Pilgrim's Pride Corp.*, 395 F.3d 471, 474 (4th Cir. 2005) (citations omitted). Generally speaking, though a "defendant's statute of limitations affirmative defense can be raised in a Rule 12(b)(6) motion to dismiss . . . it is seldom appropriate to do so." *Diop v. BMW of N. Am., LLC*, 511 F. Supp. 3d 679, 684 (E.D.N.C. 2021) (citing *Richmond, Fredericksburg &*

---

[11] Defendant's reliance on *H&M Co. v. Technical Heat Transfer Services* is misplaced. That case did not involve automobile manufacturers and authorized dealerships; rather, the plaintiff was a general contractor suing several subcontractors who were not parties to the original contract. The court found lack of privity because "the Complaint [did] not allege any facts from which the Court could [] infer that [plaintiff] either believed defendants to be parties with whom they were contracting, or that defendants provided [plaintiff] with warranty services[.]" *H&M Co. v. Tech. Heat Transfer Serv's,* Civ. No. TDC-14-1518, 2015 WL 1472000, at *5 (D. Md. Mar. 30, 2015). Here, the Warranty explicitly states that "Hyundai Motor America warrants your new [] Hyundai vehicle pursuant to the limited warranties described in this Owner's handbook," ECF 18-2, at 18; ECF 18-3, at 16, and Plaintiffs allege that Defendant and their licensed dealers "sell [vehicles] to the public on terms established by [Defendant]," which establishes that Plaintiffs believed Defendant to be a party with whom they were contracting. ECF 13, at 7 ¶ 35.

*Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993) for the principle that "[a] motion under

Rule 12(b)(6) is intended to test the legal adequacy of the complaint, and not to address the merits

of any affirmative defenses"). Accordingly, a statute of limitations defense must "clearly appear[]

on the face of the complaint," *Forst*, 4 F.3d at 250, and the "burden of establishing the affirmative

defense rests on the defendant." *Diop*, 511 F. Supp. 3d at 684 (quoting *Goodman v. Praxair, Inc.*,

494 F.3d 458, 464 (4th Cir. 2007)).

In Count III, Plaintiffs bring a claim for breach of an implied warranty. ECF 13, at 21–24.

Defendant argues that in Maryland "[t]he statute of limitations for a breach-of-warranty claim is

four years from original tender of delivery." ECF 18, at 23 (citing Md. Code Ann., Com. Law §

2-725 (1)). Therefore, because the Plaintiffs purchased their vehicles in 2016 and 2017, *see supra*

Section I.B, Defendant argues that the filing of this case on January 30, 2023, and the joinder of

named Plaintiffs after that date, falls well outside the statute of limitations for this claim.[12] ECF

18-1, at 24–25.

Under Maryland law, generally, "[a]n action for breach of any contract for sale must be

commenced within four years after the cause of action has accrued" and such an "action accrues

---

[12] Specifically, Defendant notes:

> The Klines were the first to file suit in January 2023, ECF No. 1, more than six
> years after they bought their 2017 model year vehicle in December 2016. [ECF 13,
> at 21] ¶ 120. Mr. Nordberg filed in March 2023, ECF No. 5, for the 2016 model
> year vehicle he purchased used in August 2019. [ECF 13, at 21] ¶ 121. . . The
> remaining Plaintiffs—Mr. Pritchett, Mr. Tzamouranis, Ms. Smith, and Mr. Bozzuto
> and Ms. Lyons—did not file suit until April 2023. ECF No. 13. Ms. Smith bought
> her 2016 model in April 2016. *Id.* [at 22] ¶ 124. Mr. Tzamouranis bought his 2017
> model in November 2016. *Id.* [at 21] ¶ 123. Mr. Bozzuto and Ms. Lyons bought
> their 2017 model in May 2017. *Id.* [at 15] ¶ 85. The latest to take tender of delivery
> was Mr. Pritchett, who leased his 2017 model in February 2018. *Id.* [at 21] ¶ 122.

ECF 18-1, at 24.

when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." Md. Code Ann., Com. Law §§ 2-725(1) and (2). "A breach of warranty," however, ordinarily "occurs when tender of delivery is made . . . ." *Id.* at § 2-725 (2).

The parties agree that Count III alleges a breach of warranty and would ordinarily be subject to a four-year statute of limitations from the delivery of the Hybrid Vehicles to the Plaintiffs. *See* ECF 18-1, at 23 ("The statute of limitations for a breach-of-warranty claim is four years from original tender of delivery."); ECF 19, at 25 ("Md. Code, Comm. Law § 2-725 provides that the limitations period will be four years from delivery . . . ."). The parties also appear to agree that such delivery occurred more than four years before the lawsuit was filed. *See supra* n. 12 (outlining the dates of delivery noted in the SAC); ECF 19, at 9–13; ECF 18-1, at 24. However, this armistice is short-lived as the parties diverge on the application of § 2-725 (2)'s exception to the general rule for those cases "where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance." Md. Code Ann., Com. Law § 2-725 (2) ("§ 2-725 (2)"). In such cases, the exception dictates, "the cause of action accrues when the breach is or should have been discovered." *Id.*[13]

Plaintiff seeks to invoke this exception by pointing to a provision in the Warranty that "explicitly identifies the implied warranty as being limited to the 'duration' of the lifetime

---

[13] As it pertains to limitations on implied warranties, the Maryland Supreme Court has affirmed that "there is no discovery rule under § 2–725." *Washington Freightliner, Inc. v. Shantytown Pier, Inc.*, 719 A.2d 541, 544–45 (Md. 1998). "By definition, an implied warranty is not explicit, and, therefore, the exception [for warranties of future performance] has no application to implied warranties." *Id.* (quoting W. Hawkland, Uniform Commercial Code Series § 2–725:02, at 725 (1994 ed.) (Hawkland)). "Stated differently, the statute of limitations will always start to run against claims based on implied warranty from the time when delivery of the goods is tendered." *Id.* (quoting same). Moreover, the statute of limitations begins to run upon "'tender of delivery' and not 'conforming tender of delivery.'" *Id.* As such, "[t]ender of nonconforming goods, therefore, will trigger the statute of limitations in warranty cases not involving explicit agreements to extend to future performance." *Id.* (citing Hawkland § 2–725:02, at 724).

warranty." ECF 19, at 26. Plaintiff points to the language of the Warranty, *id.* at 25, which provides that "[a]ny implied warranty of merchantability or fitness for a particular purpose is limited to the duration of these written warranties, except where the duration of implied warranties is limited by state law in which case the state law duration limit shall apply." ECF 18-2, at 18; ECF 18-3, at 16. Plaintiff contends the action is timely because the Warranty expressly extended the relevant statute of limitations. ECF 19, at 25 (noting that the Warranty explicitly extends "the duration" of the relevant portion "for the life of the ownership of the car, or for the first 10 years, or 100,000 miles for Mr. Nordberg and other subsequent purchasers"). Plaintiff further alleges that the suit was brought promptly after each named Plaintiff discovered an alleged breach. *See id.* at 26 ("No breach of the implied warranty accrued, under [the Defendant's] warranty terms, until the batteries failed prematurely, which may have been more than four years after purchase."). Accordingly, Plaintiffs dispute that Count III is untimely.

Defendant disagrees and points to *Shaw v. Brown & Williamson Tobacco Corp.*, which notes that "actions for breach of an implied warranty cannot extend to future performance since such an extension must be explicit." ECF 20, at 9 (quoting 973 F. Supp. 539, 550 (D. Md. 1997) (citing *Rockstroh v. A.H. Robins Co., Inc.*, 602 F. Supp. 1259, 1268–69 (D. Md. 1985)). Since the Warranty does not explicitly extend to future performance beyond the limits of state law, Defendant contends that "Count III is untimely under the UCC's four-year period of limitations." ECF 18-1, at 25. Defendants have the better argument.

The law is clear, the future warranties exception in § 2-725 (2) applies only when the warrantor expressly warrants that the product will have a particular quality for a particular duration of time. *Brocious v. United States Steel Corp.*, 429 F. Supp. 3d 82, 89 (D. Md. 2019) (citing *Joswick v. Chesapeake Mobile Homes, Inc.*, 765 A.2d 90, 96 (Md. 2001)). By its plain terms, the

Warranty does extend beyond four years, including any "implied warranty of merchantability or fitness for a particular purpose." ECF 18-3, at 15–16; ECF 18-2, at 17–18. However, Plaintiffs ignore that this extension comes with one important caveat: "except where the duration of implied warranties is limited by state law, *in which case the state law duration limit shall apply.*" *Id.* (emphasis added). In Maryland, that period is four years from the date of delivery. *See Washington Freightliner, Inc.,* 719 A.2d at 551 ("For the purpose of limitations on implied warranties, the ordinary rule is that the four years begins to run when the goods are delivered.").

As noted, the statute of limitations is an affirmative defense that must ordinarily be raised and proven by a defendant. It can only be raised on a 12(b)(6) motion "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint." *Goodman,* 494 F.3d at 464. This case presents circumstances suitable to raise the affirmative defense at the Rule 12(b)(6) stage. The SAC confirms that Plaintiffs filed suit well after the four-year statute of limitations had run. The plain text of the Warranty makes clear that the exception in § 2–725 (2) does not apply. Accordingly, Count III is dismissed.

4.    Count V is duplicative.

In Count V, Plaintiffs seek a declaratory judgment of their legal rights under the Warranty agreement. *See* ECF 13, at 26–27 (seeking a declaration of Plaintiffs and others in the Class to the "right to prompt replacement of batteries that have failed and will fail in Hyundai Sonata Plug-in Hybrids sold in the US during the relevant time period"). Defendant argues Count V should be dismissed, as it is duplicative of Count I. *See* ECF 18-1, at 26–27.

Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, the Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Court has discretion "in determining whether and when to entertain an action under the Declaratory Judgment Act." *Wilton*

*v. Seven Falls Co.*, 515 U.S. 277, 282 (1995); *Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co.*, 139 F.3d 419, 421 (4th Cir. 1998) ("*Aetna*") (per curiam) ("This circuit has long recognized the discretion afforded to district courts in determining whether to render declaratory relief.").

A "district court should normally entertain a declaratory judgment action when it finds that the declaratory relief sought: (1) 'will serve a useful purpose in clarifying and settling the legal relations in issue,' and (2) 'will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Aetna*, 139 F.3d at 422 (quoting *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321 (4th Cir. 1937)). Defendant argues that "it is well-settled that, '[w]here a party brings a breach of contract claim directly, there is no need for a declaratory judgment action.'" ECF 18-1, at 26 (quoting *Eremah v. Assurity Life Ins. Co.*, Civ. No. DKC 20-2069, 2020 WL 6544833 (D. Md. Nov. 6, 2020); *see also id.* (citing *Nason Constr., Inc. v. Hebrew Quality Constr., Inc.*, Civ. No. SAG-19-3013, 2020 WL 6044295, at *6 (D. Md. Oct. 13, 2020) and *Geist v. Hispanic Info. & Telecomm's Network, Inc.*, Civ. No. PX-16-3630, 2018 WL 1169084 (D. Md. Mar. 6, 2018), which held that "[w]here the same conduct underlies claims for declaratory judgment and breach of contract, 'courts generally dismiss the declaratory judgment claim as duplicative in favor of the better or more effective remedy of the underlying litigation itself'" (quoting *Dorset Indus., Inc. v. Unified Grocers, Inc.*, 893 F. Supp. 2d 395, 403 (E.D.N.Y 2012)); *see also John M. Floyd & Assocs. v. Howard Bank*, Civ. No. RBD-18-2887, 2019 WL 1755968, at *4 (D. Md. April 18, 2019) (finding plaintiff's request for the court "to declare that [the defendant] is in breach of the [] Agreement and owes monetary damages to [the plaintiff], [is] in essence, asking this Court to decide on the breach of contract issue")); *Iqvia Inc. v. Khan*, Civ. No. DKC-19-3462, 2020 WL 2395602, at *2 n.1 (D. Md. May 12, 2020) ("When a party brings a claim

directly, such as the breach of contract and tortious interference claims in counts two and three, there is no need for a declaratory judgment action.") (citations omitted).

Defendant argues the same alleged conduct underlies Counts I, II, and V, as all three counts "incorporate the same alleged predicate facts" and "seek redress for [Defendant's] alleged failure or refusal to honor an express warranty that Plaintiffs claim [Defendant] extended to them." ECF 18-1, at 26 (first citing ECF 13, at 18-19, 25 ¶¶ 101, 108, 149, then citing ECF 13, at 19, 20, 26 ¶¶ 107, 114, 155).

Plaintiffs do not appear to deny these similarities between counts, and they acknowledge that "a district court is permitted to decline to consider a declaratory judgment action when it has 'good reason' to do so." ECF 19, at 28–29 (citing *Nason Constr., Inc.*, 2020 WL 6044295, at \*6). However, Plaintiffs assert that because potential class members have claims that are not yet ripe and, given the lifetime warranty and the likelihood of other potential class members "as more batteries deteriorate and fail," ECF 19, at 20, "it would be an efficient use of judicial resources to permit this declaratory judgment claim." *Id.* at 29–30 (quoting *In re Atlas Roofing Corp. Chalet Shingle Prod. Liab. Litig.*, 22 F. Supp. 3d 1322, 1331–32 (N.D. Ga. 2014) ("*Atlas*")).

Defendant criticizes Plaintiffs' reliance on one out-of-circuit case given the breadth of routine dismissals of comparable cases within this circuit. *See* ECF 20, at 12 ("[Plaintiffs] would have the Court simply ignore District of Maryland authorities to follow what one judge did one time in Georgia."). Additionally, Defendant faults Plaintiffs for failing to distinguish this case from relevant in-circuit cases like *Nason. Id.* at 11. To be fair to Plaintiffs, some differences are readily apparent between these in-district cases and *Atlas*. Most notably, none of the in-district cases Defendant cites in its motion to dismiss are class actions that involve potential class members with unripe claims. *See* ECF 18-1, at 26–27 (citing *Nason*, 2020 WL 6044295, at \*1 (involving a

contractual dispute between a contractor and subcontractor); *Geist*, 2018 WL 1169084, at *1 (involving contractual dispute between a corporation and the sole member and Managing Partner of an LLC); *Eremah*, 2020 WL 6544833, at *9 (involving breach of contract dispute over life insurance between an insurer and two beneficiaries of that policy)).

Ultimately, however, the Court concludes that despite this difference, the authority cited by Defendants is nonetheless persuasive. Maintaining Count V does not "serve a useful purpose in clarifying and settling the legal relations in issue," nor does the Court find that it will "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Aetna*, 139 F.3d at 422 (citation omitted). In fact, leaving the door open to future owners who are not experiencing battery performance issues *increases* the level of uncertainty concerning Defendant's liability to purchasers of the Hybrid Vehicles. Additionally, because Count I will determine the legal entitlement of Plaintiffs under the Warranty, ECF 13, at 19–21, a duplicative count does not serve a useful purpose in "clarifying or settling the legal relations in issue." *Aetna*, 139 F.3d at 422. Count V is dismissed.

### B.    Claims that "Allege Fraud" are Sufficiently Pled.

Plaintiffs bring four claims Defendant contends are subject to a heightened pleading standard: Counts VI ("Fraud"), X ("Violation of the Consumer Legal Remedies Act"), XI ("Violations of California False Advertising Law"), and XIII ("Oregon Unlawful Trade Practices Act – Or. Rev. Stat. §§ 646.605, et seq."). ECF 18-1, at 27–33 (citing ECF 13, at 27–38). The Federal Rules of Civil Procedure provide a heightened pleading standard for allegations of fraud. *See* Fed. R. Civ. P. 9(b). The relevant rule states that a party "alleging fraud or mistake, . . . must state with particularity the circumstances constituting fraud or mistake." *Id.* This includes a requirement to note "the time, place, and contents of the false representations, as well as the

identity of the person making the misrepresentation and what he obtained thereby." *Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 219 (4th Cir. 2015) (quoting *Harrison*, 176 F.3d at 784); *see also* Fed. R. Civ. P. 9(b) (noting allegations of intent or knowledge "may be alleged generally").

Defendant notes that "Rule 9(b) refers to alleging fraud, not to causes of action or elements of fraud." ECF 18-1, at 28 (quoting *Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 629 (4th Cir. 2008)). Accordingly, this heightened pleading standard applies "where the gravamen of the claim is fraud even though the theory supporting the claim is not technically termed fraud." *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 250 (D. Md. 2000). Defendant argues that Counts VI, X, XI, and XIII "alleg[e] fraud" and Defendant provides a table identifying the Plaintiffs' allegations that support this heightened pleading standard. *See* ECF 18-1, at 28–29. Plaintiffs do not contest that Rule 9(b) applies to Counts VI, X, XI, and XIII. *See* ECF 19, at 30–36 (failing to contest the application of Fed. R. Civ. P. 9(b) to these counts).

Plaintiffs argue that they have satisfied the rule by sufficiently alleging "[w]ho made the statement ([Defendant]), what was stated (the written warranty statement), when the fraudulent statement was said (the approximate date of purchase), where the statement was made (the dealership where the purchase was concluded), and what [Defendant] obtained through the use of the fraudulent warranty statement (the sale of an experimental car, that each of the plaintiffs allege they would not have purchased but for the promise of a lifetime warranty on the battery[])." ECF 19, at 34.

Defendant counters that Plaintiffs "fabricate[] allegations that appear nowhere in the [Second Amended Complaint]." ECF 20, at 3. Specifically, Defendant accuses Plaintiff of incorrectly alleging that representations were made when Plaintiffs actually purchased the cars. *Id.* However, as explained above in the discussion of privity, the Court finds that it is a reasonable

inference that "[t]he written warranty [Defendant] provided to purchasers" was provided at the time of purchasing. *Nemet Chevrolet, Ltd.*, 591 F.3d at 253; *see supra* Section III.A.2.

"The Fourth Circuit has cautioned that '[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Lima One Cap. LLC v. DAC Acquisitions LLC*, Civ. No. 19-03547, 2020 WL 5816739, at *5 (D.S.C. Sept. 30, 2020) (quoting *Harrison*, 176 F.3d at 784). The Court is satisfied that Defendant has been made aware of the particular circumstances for which it will have to prepare a defense at trial. Defendant knows the month and year that each Plaintiff purchased their vehicle, Defendant knows the VIN numbers for almost every vehicle purchased by named plaintiffs, Defendant knows where the named Plaintiffs purchased their vehicles, Defendant knows the contents of the alleged fraud, and Defendant knows that the Warranty that conveyed the allegedly fraudulent information came from Defendant. As such, Defendant is sufficiently apprised of the "who, what, when, where, and how of the alleged fraud." *U.S. ex rel. Wilson*, 525 F.3d at 379. This is sufficient to put Defendant on notice of the action with particularity. Counts VI, X, XI, and XIII survive Defendant's motion to dismiss.

### C.    Consumer Protection Claims

1.    Count IV is dismissed as to the MMWA class claims, but the individual claims under the MMWA survive.

The Magnuson–Moss Warranty Act ("MMWA") is "a remedial statute designed to protect the purchasers of consumer goods from deceptive warranty practices." *Chavis v. Fid. Warranty Servs., Inc.*, 415 F. Supp. 2d 620, 622 (D.S.C. 2006). Under the MMWA, a consumer may bring suit for damages and other legal and equitable relief: "(A) in any court of competent jurisdiction in any State or the District of Columbia; or (B) in an appropriate district court of the United States,

*subject to paragraph (3) of this subsection.*" 15 U.S.C. § 2310(d)(1) (emphasis added).  Under

paragraph 3 of § 2310(d), the MMWA specifies that "[n]o claim shall be cognizable in a suit

brought under [§ 2310(d)(1)(B)]—(A) if the amount in controversy of any individual claim is less

than the sum or value of $25; (B) if the amount in controversy is less than the sum or value of

$50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in

this suit; or (C) if the action is brought as a class action, and the number of named plaintiffs is less

than one hundred." 15 U.S.C. § 2310(d)(3).

Defendants assert that "[u]nder the plain statutory terms of the [MMWA] a claim

thereunder brought in federal court is not cognizable as a class action if 'the number of named

plaintiffs is less than one hundred.'" ECF 18-1, at 25 (citing 15 U.S.C. § 2310(d)(3)(C)).  Since

the putative class outlined in the claim has only eight members, Defendants contend it must be

dismissed. *Id.* (citing *Floyd v. Am. Honda Motor Co.*, 966 F.3d 1027, 1034 (9th Cir. 2020)).

Plaintiffs concede that "the Court may not adjudicate the putative class members' claims under the

[MMWA] in this case, because the [MMWA] requires 100 named plaintiffs in order to certify a

class." ECF 19, at 26.[14]  However, Plaintiffs assert that the Court should not dismiss the named

---

[14] The Court notes that there is some disagreement over "the jurisdictional interplay of the CAFA
and the MMWA." *Kuns v. Ford Motor Co.*, 543 F. App'x 572, 574 (6th Cir. 2013).  "[D]istrict
courts have, as a general rule, held that the CAFA effectively supercedes the MMWA's more
stringent jurisdictional requirements." *Id.* at 182.  These lower court holdings are based on the
understanding that because "CAFA was passed with the clear intention of expanding federal court
jurisdiction over class actions[,] . . . [it] provides an alternate basis by which federal courts may
become courts of 'competent jurisdiction' under 15 U.S.C. § 2310(d)(1)(A)." *See Chavis*, 415 F.
Supp. 2d at 626; *see also Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575, 614 (D. Md.
2014) ("In such circumstances—as here—the amount in controversy and '100 named plaintiff'
requirements are no obstacles to the claim being heard in federal court because the court can
exercise supplemental jurisdiction over the MMWA claim provided another jurisdictional basis
exists.").  The Fourth Circuit has not addressed this issue.  The few circuits that have addressed it
appear to be split on the issue. *See Kuns*, 543 F. App'x at 574 ("We agree that the district court
had jurisdiction notwithstanding the MMWA's jurisdictional limitations."); *but see Rowland v.
Bissell Homecare, Inc.*, 73 F.4th 177, 182 (3d Cir. 2023) ("It would thus contradict Congress'

Plaintiffs' *individual* claims under the MMWA because the value of the six claims at issue can be aggregated to satisfy the $50,000 jurisdictional threshold under § 2310(d)(3)(b). *Id.* at 27.

Plaintiffs' SAC is styled as a "Class Action Complaint," with "class action allegations." ECF 13, at 1; *id.* at 16–18. However, Plaintiffs also explicitly bring their MMWA claims "individually." *Id.* at 24 ¶ 136. In that sense, Plaintiffs' individual allegations are similar to those before the court in *Heater v. Gen. Motors, LLC*, 568 F. Supp. 3d 626, 644 (N.D. W. Va. 2021). In *Heater*, the trial court dismissed a nationwide MMWA class action claim because the lone plaintiff in that case "lacked standing to bring claims on behalf of a nationwide class." *Id.* at 644. However, the court continued by analyzing the plaintiff's individual MMWA claim and found that it "derive[d] from his state law warranty claims, and [that the plaintiff had] sufficiently pleaded an implied warranty of merchantability claim under West Virginia law." *Id.* Under the logic of *Heater*, the Court is willing to accept Plaintiff's theory that individual MMWA claims can move forward even when a class MMWA claim has been dismissed. However, Plaintiffs seek to maintain their individual claims pursuant to § 2310(d)(1)(B), which necessarily requires Plaintiffs to satisfy all relevant elements of § 2310(d)(3). *See Barr v. General Motors Corp.*, 80 F.R.D. 136, 140 (S.D. Ohio 1978) ("§ 2310(d)(3)(C) only applies 'if the action is brought as a class action,' which indicates that subsections (A) and (B) are intended to apply in individual actions as well as class actions.") (quoting 15 U.S.C. § 2310(d)(3)(C)).

---

intent to read [15 U.S.C.] § 2310(d)(1)(A) as providing an alternative and less restrictive path to litigating MMWA claims in federal court. Therefore, MMWA claims can only be brought in federal court if the § 2310(d)(3) requirements are satisfied."); *Floyd*, 966 F.3d at 1035 ("CAFA may not be used to evade or override the MMWA's specific numerosity requirement, and we affirm the district court's dismissal of the MMWA claim."). Plaintiffs make no argument in their response that CAFA provides independent jurisdiction over their MMWA claims. In fact, they explicitly concede that they are not seeking to pursue MMWA claims on a class-wide basis. Accordingly, the Court need not address whether "CAFA effectively supercedes the MMWA's more stringent jurisdictional requirements." *Kuns*, 543 F. App'x at 182.

As to those subsections, Plaintiffs allege that the amount in controversy exceeds $50,000. *See* ECF 13, at 24 ¶ 140. Though admittedly conclusory, Plaintiffs' response to the motion, *see* ECF 19, at 27 n. 5, provides enough explanation for the Court to construe the SAC as alleging in good faith an aggregate sum in excess of $50,000, and that none of the individual claims fall below $25. *See St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–89 (1938) ("The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal."); *see also Wiggins v. N. Am. Equitable Life Assur. Co.*, 644 F.2d 1014, 1016 (4th Cir. 1981) ("Ordinarily the jurisdictional amount is determined by the amount of the plaintiff's original claim, provided that the claim is made in good faith."). Given that each Plaintiff has alleged the "failure of a . . . warrantor . . . to comply with a written [or] implied warranty,"[15] the Court is satisfied at this stage that the individual MMWA claims can proceed.[16]

---

[15] In a footnote, Defendant raised one additional argument concerning whether Plaintiffs' individual MMWA claims are "in an appropriate district court of the United States" pursuant to 15 U.S.C. § 2310 (d)(1)(B). *See* ECF 20, at 12 n. 10 ("Regardless, as Counts II and III are subject to dismissal, nothing remains to be adjudicated under Count IV."). Though the Court agrees that Count III must be dismissed, Count II remains, and with it, the individual MMWA claims.

[16] Though Defendant argues that Plaintiffs' reliance on *Nyarko v. BMW of N. Am., LLC*, No. CV RDB-18-3618, 2020 WL 1491361, at *1 (D. Md. Mar. 27, 2020) is misplaced because that case was not a class action, it does provide a template for the pleading requirements to maintain individual actions under the MMWA. In analyzing individual MMWA claims, Judge Bennett found that "Plaintiffs may aggregate their claims to satisfy the $50,000 amount-in-controversy requirement set forth in § 2310(d)(3)(B), so long as their claims have been properly joined under Rule 20 of the Federal Rules of Civil Procedure." *Id.* at *4 (citations omitted). Defendant did not address the issue of joinder in its response, and a cursory review of the issue reflects that while there "are certainly differences among Plaintiffs' claims," they each allege a similar problem associated with the hybrid battery in the Hybrid Vehicle, and alleged similar failures to honor identical warranties. *Id.* As such, joinder is proper at this stage. *Id.*

36

2.     Count VII states a plausible claim under the Maryland Service Contracts and Consumer Products Guaranty Act.

Defendant recycles its earlier argument regarding whether Plaintiffs have properly alleged a manufacturing defect in arguing that that the Maryland Service Contracts and Consumer Products Guaranty Act ("MCPGA") only covers manufacturing defects, not design defects.[17] ECF 18-1, at 33–34. According to Defendant, Plaintiffs' SAC concerns only an "alleged design defect," and thus the MCPGA "simply does not support a claim concerning the design defect that is the subject of the SAC." *Id.* at 34. As discussed above, Plaintiffs allege facts that make it sufficiently plausible that a manufacturing defect, as opposed to a design defect, was the source of the battery failures. *See supra* Section III.A.1. Moreover, Plaintiffs observe that Md. Comm. Code § 14-401(d)(1)(ii) "explicitly protects consumers against defects in materials and workmanship *or* [where the product] *fails to meet a specified level of performance.*" ECF 19, at 36 (emphasis in original) (internal quotation marks omitted). Because Plaintiffs allege that Defendant made specific representations about the ability of the Hybrid Vehicle to run a specified number of miles without gasoline power, ECF 13, at 22 ¶ 129, and Plaintiffs allege that Defendant expressly warranted that the "batteries would not excessively degrade 'more than 70 percent of the original capacity during the warranty period,'" ECF 19, at 36 (citing ECF 13, at 11, 22 ¶¶ 58, 128), it is plausible that Defendants specified a level of vehicle performance that the vehicles failed to meet. Thus, Defendant's motion to dismiss Plaintiffs' claim under the MCPGA fails.

3.     Count VIII states a plausible claim under the Maryland Consumer Protection Act.

Defendant asserts that Plaintiffs do not state "a specific alleged misrepresentation," and thus their claim fails under the Maryland Consumer Protection Act ("MCPA") because the statute

---

[17] The Klines are the only named Maryland Plaintiffs.

requires a "representation that consumer goods or consumer services 'have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have' or 'are of a particular standard, quality, grade, style, or model which they are not.'" ECF 18-1, at 34 (citing Md. Code Ann., Com. Law § 13-301(2)(i), (iv)). As discussed above, Plaintiffs allege that Defendant "specified that its batteries would not excessively degrade 'more than 70 percent of the original capacity during the warranty period,'" ECF 19, at 36 (citing ECF 13, at 11, 22 ¶¶ 58, 128), and that Defendant impliedly warranted that the car was "fit for the particular and unique purpose of a hybrid vehicle which can be operated for up to 27 miles without gasoline power." ECF 13, at 22 ¶ 129; *id.* at 5 ¶ 24.[18] Accordingly, these facts establish that it is plausible that Defendants made specific representations to the public about a particular "characteristic," "use," "benefit," "standard, quality, [or] grade" of their vehicles that the vehicles did not have. Thus, Plaintiffs have pled facts sufficient to state a claim under the MCPA on behalf of the Maryland subclass.

        4.    The Song-Beverly claims alleged in Count IX all survive dismissal, except for Plaintiff Smith's claim.

California's Song-Beverly Consumer Warranty Act ("The Song-Beverly Act") "protects purchasers of consumer goods by requiring specified implied warranties, placing strict limitations on how and when a manufacturer may disclaim those implied warranties, and providing

---

[18] The Court is not persuaded by Defendant's argument that the Court should reject all assertions set forth in ECF 13 at 5, 11 ¶¶ 25–27, 29, and 58 because it constitutes "improper amendment by briefing because none [of the assertions are] tied to the Klines." ECF 20, at 14. First, Plaintiffs assert that Defendant "impliedly warranted to the Klines" that "the car was fit for the particular and unique purpose of a hybrid vehicle which can be operated for up to 27 miles without gasoline power." ECF 13, at 22 ¶ 129. The Plaintiffs then fully incorporate this paragraph into Count VIII. *See id.* at 30 ¶ 176. Moreover, the Court draws all reasonable inferences in favor of the Plaintiffs at this stage, and it is reasonable for this Court to infer that some of the representations made by the Defendant to other class members could have plausibly been made to the Klines as well. Lastly, the allegations in ECF 13, at 5, 22 ¶¶ 24, 128, 129 are sufficient to establish that there were representations made to the public. It is reasonable to infer, then, that the public includes the named Plaintiffs, and specifically, the Klines.

mechanisms to ensure that manufacturers live up to the terms of any express warranty." *Cummins, Inc. v. Superior Court*, 36 Cal. 4th 478, 484 (2005). The protections offered in the Song-Beverly Act "apply only to vehicles sold in California." *Aquair Ventures, LLC v. Gulf Stream Coach, Inc.*, No C-08-2903, 2009 WL 150963, at *2 (N.D. Cal. Jan. 21, 2009) (citing *Cummins*, 36 Cal. 4th at 478). Plaintiffs state "there is not yet enough information to determine whether [Smith] is protected as a California purchaser," but that she purchased her vehicle "through a dealer in Arizona, where she resides." ECF 19, at 38. The burden rests with the Plaintiffs to allege facts that Smith's vehicle was sold in California, and thus plausibly falls within the class subject to protection under California's Song-Beverly Act. Plaintiffs have not done so, and in fact, asserted that Smith purchased her vehicle from Swanty Hyundai in Kingman, Arizona and that Swanty Hyundai was able to "locate a new 2016 Sonata Plug-in-Hybrid at a California dealership, acquire it, and sell it to [Smith]." ECF 13, at 14 ¶¶ 78, 80. Accordingly, Smith's claim under the Song-Beverly Act is dismissed.

Plaintiff Nordberg purchased a used 2016 Hybrid Vehicle from a Carmax dealer in Roseville, California. ECF 13, at 10 ¶ 49. Defendant argues that the Song-Beverly Act "does not apply to sales of used vehicles." ECF 18-1, at 36. Plaintiffs assert that there is an exception to this rule when Defendant "explicitly extend[s] its warranty protections to 'subsequent purchasers.'" ECF 19, at 38. Unlike the Plaintiff in *Barboza v. Mercedez-Benz USA, LLC*, No. 22-cv-0845, 2022 WL 17978408, at *3 (E.D. Cal. Dec. 28, 2022), the SAC alleges that an express warranty for subsequent purchasers exists, identifies the terms of the alleged express warranty, argues that Nordberg relied on those terms in purchasing the car, asserts that the battery (which was the particular part allegedly covered under the express warranty) failed in Nordberg's car, and states that Defendant failed to repair or replace the battery. ECF 13, at 11 ¶¶ 57-61. As such, it is

plausible that Nordberg is a subsequent owner, ECF 13, at 10 ¶ 49, who was provided with a new express warranty or the original warranty was expressly extended to the vehicle, *id.* at 13 ¶¶ 57, 58, and therefore may be protected under the Song-Beverly Act.

Defendant asks the Court to look at the 2016 warranty which does not contain a provision for subsequent owners, only original owners. *See* ECF 20, at 14–15 (citing ECF 18-2, at 23). However, the 2017 warranty does include a provision for subsequent owners. *See* ECF 18-3, at 22. Nordberg alleges that he purchased a used 2016 Hybrid Vehicle, so Defendant has a basis to argue that the 2017 warranty provision is inapplicable. Moreover, Defendant appears to be correct that the quoted representation of a limited warranty for subsequent owners alleged in the SAC, ECF 13, at 11 ¶ 58, does not appear in either warranty found at ECF 18-2 or ECF 18-3. Plaintiffs do not cite the limited warranty directly; they are content to claim that Defendant made a specific "representation to subsequent purchasers"[19] that serves as an express warranty. ECF 13, at 11 ¶ 58. It is obviously not clear when, and in what exact form this representation was made to Nordberg. However, given the specificity with which Plaintiffs have alleged this guarantee was provided, the Court will deem it sufficient "to survive the low bar of a motion to dismiss." *Sulton*

---

[19] The SAC alleges:

HMA's representation to subsequent purchasers included the following statement:

We are committed to giving you the confidence and peace of mind that comes with knowing your Hyundai is built with the highest quality and care. That is why we cover our batteries and system components for your hybrid, plug-in hybrid, and all electric vehicles with a 10-year/100,000-mile warranty. While all electric-car batteries will experience degradation over time, ours will not degrade more than 70 percent of the original capacity during the warrant[y] period.

ECF 13, at 11 ¶ 58. No source is quoted for this claim and as noted, it does not appear in the documents provided at ECF 18-2 and ECF 18-3.

*v. Baltimore Cnty., Maryland*, Civ. No. SAG-18-2864, 2021 WL 948820, at *6 (D. Md. Mar. 12, 2021).

Lastly, Defendant claims that Plaintiffs Bozzuto and Lyons fail to state a cognizable claim under the Song-Beverly Act because the express warranty covers "defects in material or workmanship," but not "design defects." ECF 18-1, at 36. Defendants again assert that the SAC alleges only design defects, and therefore allege that the Song-Beverly Act cannot be used to "change the terms of an express warranty." *Id.* For the reasons stated in *supra* Section III.A.1, Plaintiffs allege facts that make it sufficiently plausible that a manufacturing defect, as opposed to a design defect, was the source of the battery failures. As such, Bozzuto and Lyons' claims survive Defendant's motion to dismiss.

    5.      Count XII is dismissed as a result of California's economic loss rule.

Defendant asserts that Plaintiffs' negligence claim under Count XII[20] is barred by California's "economic loss rule," which prohibits "a negligence claim for purely economic loss." ECF 18-1, at 37. Plaintiffs state that the claim is grounded in negligent misrepresentation, rather than negligence, which they allege implicates a different analysis. ECF 19, at 39 (citing *Lloyd v. General Motors Corp.*, 397 Md. 108, 137 (2007) (noting that "economic losses qualify as a cognizable injury under negligent misrepresentation")). The economic loss rule "prevents the law of contract and the law of tort from dissolving into one another." *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004) (citation omitted). Economic loss consists of "damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits—without any claim of personal injury or damages to other property." *Id.* (citation

---

[20] Because Count XII is brought on behalf of a subclass of persons who are "subsequent purchasers" of the Hybrid Vehicles, Mr. Nordberg is the only named Plaintiff this count applies to. ECF 13, at 36 ¶ 217. Because Mr. Nordberg is a resident of California who purchased his Hybrid Vehicle in California, California law applies.

omitted). "The economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." *Id.* In California, "[t]ort damages have been permitted in contract cases where a breach of duty directly causes physical injury[,] for breach of the covenant of good faith and fair dealing in insurance contracts[,] for wrongful discharge in violation of fundamental public policy[,] or where the contract was fraudulently induced." *Erlich v. Menezes*, 21 Cal. 4th 543, 551–52 (1999) (internal citations omitted). "In each of these cases, the duty that gives rise to tort liability is either completely independent of the contract or arises from conduct which is both intentional and intended to harm." *Id.* at 552. "An omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty." *Id.* at 551.

The SAC clearly alleges that Defendant's purportedly tortious conduct and misrepresentations "were all made pursuant to a purely contractual duty." *United Guar. Mortg. Indem. Co.*, 660 F. Supp. 2d at 1184. Plaintiffs' claim is based solely on the representations Defendant allegedly made to Mr. Nordberg and subsequent purchasers about the battery warranty. ECF 13, at 36–37, ¶¶ 218, 219, 221. Plaintiffs do not allege facts "independent of the contract," or facts which establish that Defendant's conduct was "intentional and intended to harm."[21] *Erlich*, 21 Cal. 4th at 552. Thus, any breach based on Defendant's misrepresentation is a breach of

---

[21] Whether Defendant "intended to harm" Plaintiffs for the purposes of the economic loss rule is a separate inquiry from whether Defendant's conduct was "unethical" or "cause[d] substantial injury" for the purposes of the Connecticut Unfair Trade Practices Act ("CUTPA"). *See supra* Section C.6. Plaintiffs' assertions that Defendant "knew or should have known that the warranty representation was false," and that there was "no reasonable basis to believe that it would be able to honor that warranty," ECF 13, at 36 ¶ 219, are conclusory statements unsupported by independent factual allegations that prove intent to harm. However, as discussed in more detail below, Plaintiffs assert specific facts alleging an infrastructure breakdown, which they claim resulted in substantial injury to the named Plaintiffs, thus leading this Court to hold that Plaintiffs plausibly allege a violation of the CUTPA.

contract and Plaintiffs cannot recover under a theory of tort liability. The negligent misrepresentation claim must be dismissed.

>6. Count XIV states a plausible claim under the Connecticut Unfair Trade Practices Act.

The Connecticut Unfair Trade Practices Act ("CUTPA") holds that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b. In assessing whether an act or practice is unfair under the CUTPA, the Connecticut Supreme Court has adopted the Federal Trade Commission's so-called "cigarette rule," which enumerates three relevant factors that courts should weigh: (1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons.] *Harris v. Bradley Mem'l Hosp. & Health Ctr., Inc.*, 296 Conn. 315 (2010) (quoting *Ramirez v. Health Net of the Northeast, Inc.*, 285 Conn. 1 (2008)). A court need not find that all three criteria have been met in order to find a given practice unfair; a practice may violate CUTPA because of the degree to which it meets one factor, or because, to a lesser extent, it meets all three. *Id.* "CUTPA requires neither reliance nor 'proof of intent to deceive, to defraud or to mislead.'" *Quinn v. Walgreen Co.*, 958 F. Supp. 2d 533, 543 (S.D.N.Y. 2013) (citing *Associated Inv. Co. Ltd. P'ship v. Williams Assoc. IV*, 230 Conn. 148, 158 (1994)). At this stage, the Court "need not and should not determine as a matter of law whether [Defendant's] conduct, as alleged, actually violated CUTPA. Instead, the proper inquiry is whether [Plaintiff] has alleged sufficient facts to 'raise a reasonable expectation that discovery will reveal evidence' supporting

the claim." *Edwards v. N. Am. Power & Gas, LLC*, 120 F. Supp. 3d 132, 142 (D. Conn. 2015) (quoting *Twombly*, 550 U.S. at 556).

Here, Plaintiffs plausibly allege that providing a battery warranty with a lifetime guarantee without sufficient infrastructure in place to satisfy the warranty's guarantee could qualify as an unethical business practice. *See* ECF 13, at 14 ¶ 76 ("Neither the dealer nor [Defendant] have been able to tell [Tzamouranis] when the battery will be replaced"). Moreover, the Connecticut subclass plausibly alleges substantial injury to consumers by asserting that: Mr. Tzamouranis was deprived of using his car for three months, ECF 13, at 14 ¶ 76-77, he suffered considerable inconvenience and incurred significant expense, including charges for high gas prices, *id.* ¶ 77, his cash investment in the Hybrid Vehicle has been rendered valueless, *id.*, and the cost of a replacement vehicle is difficult and costly. *Id.* Based on the facts alleged and making all inferences in favor of Plaintiffs, as the Court must do at this early stage, the Court finds that Plaintiffs have pled facts sufficient to state a claim under CUTPA on behalf of the Connecticut subclass.

## IV.   **CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss is GRANTED in part and DENIED in part.

A separate implementing Order will issue.

Dated: September 26, 2024

/s/
Brendan A. Hurson
United States District Judge